# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **PAUL MIANULLI,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 07-1129 (RMC)** |
| ) | |
| **JOHN E. POTTER,** ) | |
| **POSTMASTER GENERAL,** ) | |
| **UNITED STATES POSTAL SERVICE,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## MEMORANDUM OPINION

Paul Mianulli filed this case under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq.*, alleging that the United States Postal Service ("USPS") unlawfully terminated his employment on the basis of his race or color, that USPS subjected him to racial harassment, and that USPS retaliated against him for engaging in protected activity.[1]  USPS has set forth a legitimate, nondiscriminatory reason for its actions, including Mr. Mianulli's termination, and has moved for summary judgment.  For the reasons set forth below, summary judgment in favor of USPS will be granted.

## I. FACTS

Mr. Mianulli, a Caucasian man, began work as a management analyst in the Mail Equipment Shops ("MES") of USPS on or about October 20, 2003.  Def.'s Statement of Material

---

[1] Originally, Mr. Mianulli also alleged a claim under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.*, but he has withdrawn that claim.  *See* Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") [Dkt. #26] at 11 n.2.

Facts as to Which There is No Genuine Dispute ("Def.'s Facts") [Dkt. #24] ¶ 1.[2]  Mr. Mianulli

was interviewed by and hired by John Worth, a Caucasian man who was plant manager.  *Id.*  Mr.

Mianulli was given a probationary term of employment for the first six months of employment.

*Id.* ¶ 4; Def.'s Mot. for Summ. J. ("Def.'s Mot.") [Dkt. # 24], Ex. C, Notification of Personnel

Action.

 Mr. Mianulli was engaged in orientation and training for the first thirty days of

employment, in Washington and Topeka, Kansas.   Def.'s Mot., Ex. H, Worth Dep. at 83.

During his first performance evaluation, after the thirty-day orientation, Mr. Mianulli was

evaluated as performing satisfactorily for "Work Quantity" and "Work Quality," and evaluated as

outstanding for "Dependability."[3]  Def.'s Mot., Ex. O, Employment Eval. at boxes 7a and 7b

(Mr. Mianulli's first evaluation was completed by Nov. 18, 2003).

 Mr. Mianulli reported directly to Mr. Worth until approximately December 16,

2003, when Mr. Worth took a position as Program Manager at USPS Headquarters and Frank

Scheer, also a Caucasian man, became the interim plant manager.  Def.'s Facts ¶ 5.  For

consistency during the probationary period, Mr. Worth remained Mr. Mianulli's ultimate

supervisor.  Def.'s Facts ¶ 7.  Mr. Worth visited the MES on a regular basis and conducted Mr.

Mianulli's performance reviews, but Mr. Scheer observed Mr. Mianulli's performance on a day-

to-day basis.  Def.'s Mot., Ex. H, Worth Dep. at 158-59.  In Mr. Mianulli's second performance

---

 [2] Mr. Mianulli filed a statement of material facts in dispute, *see* [Dkt. # 31], but he did not directly or indirectly controvert the statements in USPS's statement of undisputed material facts, *see* [Dkt. # 24].  Accordingly, the facts identified by USPS are deemed conceded.  LCvR 7(h).

 [3] Work Quantity means "the employee works efficiently and in a timely manner," Work Quality means "error free work that is performed within the expectations of the position," and Dependability means complying with deadlines.  Def.'s Mot., Ex. B, Worth Aff. ¶¶ 7-9.

review, dated January 7, 2004, Mr. Worth again concluded that Mr. Mianulli's Work Quantity

and Work Quality were satisfactory and his Dependability was outstanding.  Def.'s Mot., Ex. O,

Employment Eval. at boxes 8a and 8b.

Despite the first two positive performance reviews, however, on February 2, 2004,

Mr. Scheer spoke with Mr. Mianulli about performance deficiencies.  Def.'s Mot., Ex. D, Scheer

Aff. ("Following the February 2, 2004, manager's meeting, I asked Paul [Mianulli] to review all

of his assignments and provide a status update.  This was because he had not provided a

December or a January accounting period summary and reasons for variances.  I stated that I was

concerned about his progress on project assignments and wanted to confirm how activity was

allocated . . . .  This was to be provided no later than a February 17, 2004 manager's meeting.

No listing of assignments and status [was] received even though at least one verbal reminder was

made.").  Mr. Scheer warned Mr. Mianulli of his concerns and informed Mr. Worth of the

problems he faced with Mr. Mianulli.  Id.; Def.'s Mot., Ex. H, Worth Dep. at 112.

On approximately February 24, 2004, Sammy Rogers, an African American man,

became the permanent plant manager and took over for Mr. Scheer.  Def.'s Facts ¶ 6.  On March

4, 2004, and March 12, 2004, Messrs. Worth, Scheer, and Rogers met with Mr. Mianulli to

discuss Mr. Mianulli's weak performance.  Id.  ¶ 8.  On March 12th, a Performance Action Plan

was put into effect; Mr. Mianulli was given a list of specific tasks to complete and specific time

frames in which to complete the tasks.  Id. ¶ 9; Def's Mot., Ex. I, Performance Action Plan.  On

March 17, 2004, Mr. Worth conducted a performance evaluation of Mr. Mianulli and concluded

that in all three areas, Work Quantity, Work Quality, and Dependability, Mr. Mianulli's

performance was unacceptable.  Def.'s Mot., Ex. O, Employee Eval. at boxes 9a and 9b.  On

March 19, 2004, Mr. Rogers had a counseling session with Mr. Mianulli to discuss his performance.  Def.'s Facts ¶ 10.

Thereafter, Messrs. Worth, Scheer, and Rogers discussed whether to terminate Mr. Mianulli, who was still within the probationary period of his employment.  Def.'s Facts ¶ 12. Mr. Worth was still Mr. Mianulli's official supervisor, and therefore Mr. Worth was ultimately responsible for the termination decision and he signed the termination letter.  *Id.*; Def.'s Mot., Ex. G, Removal Letter.

Mr. Mianulli asserts that on March 23, 2004, before he was terminated, he called his second-line supervisor, James McConnell, and complained that he was being discriminated against because of his race and/or color.  Pl.'s Opp'n, Ex. A, Mianulli Dep. at 63-64.  Mr. McConnell does not recall any conversation of this nature and Mr. Mianulli has not provided any evidence to suggest that if the call were made, Mr. Worth was aware of it or any other alleged protected activity taken by Mr. Mianulli.  Def.'s Mot., Ex. E, McConnell Decl. ¶ 9.  On March 24, 2004, Mr. Worth terminated Mr. Mianulli's probationary employment at USPS.  Def.'s Mot., Ex. G, Removal Letter.

## II. STANDARD OF REVIEW

A party is entitled to summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  Summary judgment is not a disfavored motion, and indeed it is proper when the nonmoving party, "after adequate time for discovery and upon

motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When considering a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than the mere existence of a "scintilla of evidence" in support of its position. *Id.* at 252. Additionally, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

### III. ANALYSIS

Mr. Mianulli alleges that he suffered reverse racial discrimination because at the time he was terminated, his immediate supervisor was an African American man. He also alleges racial harassment from this same supervisor and retaliation based upon a phone call he placed to his second-line supervisor, Mr. McConnell, the day before he was terminated.

#### A.  Racial Discrimination and Harassment

Title VII prohibits federal agencies from engaging in workplace discrimination based on race, color, religion, sex, or national origin. 42 U.S.C. § 2000e *et seq*. Mr. Mianulli asserts that he suffered two adverse employment actions as a result of direct racial discrimination. The first allegedly adverse employment action occurred on or about March 12,

2004, when he was placed on a Performance Action Plan.  The second was his termination from USPS on March 24, 2004.

Being placed on a Performance Action Plan can be, but is not always, an adverse employment action.  *See Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003).  A Performance Action Plan is an adverse employment action only if it significantly changes the plaintiff's employment status.  *Id*  (no adverse employment action because plaintiff did not present any evidence that the plan or the delay in performing her annual evaluations affected her grade or salary)*.*  Mr. Mianulli has not presented any evidence that suggests his employment status was affected by the Performance Action Plan, and therefore the only adverse employment action at issue in this case is Mr. Mianulli's termination.  *See Mayers v. Laborers' Health & Safety Fund of N. Am.*, 478 F.3d 364, 368 (D.C. Cir. 2007) (termination is a discrete adverse employment action).

USPS contends that it terminated Mr. Mianulli for the legitimate, non-discriminatory reason that he was not performing his work satisfactorily.   If the employer presents a legitimate, non-discriminatory reason for taking an adverse employment action, the court must consider whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin."  *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).  In so doing, the court must consider whether discrimination could be inferred from the evidence the plaintiff set forth to establish a prima facie case, from the evidence plaintiff used to

attack the employer's proffered reason for the adverse employment action, and any other evidence in the record. *Farris v. Clinton*, 602 F. Supp. 2d 74, 82 (D.D.C. 2009).

To prevail on his discrimination claim, Mr. Mianulli must therefore put forth evidence that USPS's stated reason for the termination is a pretext for intentional racial discrimination. *See Baloch v. Kempthorne*, 550 F.3d 1191, 1198 (D.C. Cir. 2008). Mr. Mianulli has failed to meet this burden. His only evidence of racial animus is the contention that when he asked Mr. Rogers a question, Mr. Rogers responded that he was "not planning on hand-holding the only white manager. I'm glad there aren't more of you." Def.'s Mot., Ex. A, Mianulli Dep. at 237-38. Mr. Rogers denies that he ever made such a statement. Def.'s Mot, Ex. P, Rogers Supplemental Aff. ¶ 5. Even assuming that this statement occurred, however, it does not support the inference, in and of itself, that Mr. Mianulli's termination was the result of reverse racial discrimination. Two of Mr. Mianulli's three supervisors, Messrs. Worth and Scheer, and Mr. Mianulli's second-line supervisor, Mr. McConnell, are all of the same race and color as Mr. Mianulli. Messrs. Worth and Scheer documented their concerns over Mr. Mianulli's poor work performance before Mr. Rogers became involved, they informed Mr. McConnell of their concerns, and they were both part of the decision-making process that led to the termination. Additionally, the person who actually decided to terminate Mr. Mianulli and who signed the termination letter — Mr. Worth — was the same person who interviewed and hired Mr. Mianulli in the first place and is of the same race and color. USPS is therefore entitled to the inference that Mr. Mianulli's supervisor would not have hired him just to turn around and immediately terminate him for an unlawful reason. *See Valles-Hall v. Center for Nonprofit Advancement*, 481

F. Supp. 2d 118, 151 (D.D.C. 2007) (referencing similar inferences found in the Second, Fourth, Fifth, Sixth, Seventh, Ninth, and Eleventh Circuits).

This information, combined with the fact that Mr. Mianulli has not challenged USPS's contention that he was performing unsatisfactorily, leads the court to conclude that a reasonable jury could not find that USPS's stated reason for terminating Mr. Mianulli was a pretext for intentional unlawful discrimination. *See Baloch*, 550 F.3d at 1198 (concluding that the employee failed to meet his burden of showing that the employer's stated reason for the employment action was a pretext for unlawful discrimination). Accordingly, USPS will be granted summary judgment on Mr. Mianulli's claim of direct discrimination.

Mr. Mianulli's remaining legal theories are unclear, but he appears to be arguing that being placed on the Performance Action Plan was a part of the ongoing racial harassment he received at USPS. This argument also fails because there is no evidence of a pattern of discrimination or harassment that was so severe or pervasive as to amount to an abusive working environment. *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). Mr. Mianulli contends that being placed on the Performance Action Plan was harassment because it involved "unreasonable deadlines." Pl.'s First Amended Compl. ¶ 13. He has offered no evidence, however, to support the self-serving and conclusory allegation that the deadlines were in fact unreasonable or that the deadlines were a result of his race or color.[4] Furthermore, the fact that Mr. Rogers may have instructed an administrative assistant not to do a project – originally

---

[4] Mr. Mianulli did offer the testimony of Edmundo Minano, a USPS employee, in which Mr. Minano stated that the deadlines placed on Mr. Mianulli were unreasonable. Minano conceded, however, that he was not qualified to make that determination. Def.'s Reply [Dkt. # 29], Ex. U, Minano Dep. at 50 & 103.

assigned to Mr. Mianulli that he had reassigned to the assistant – does not amount to severe or pervasive harassment, and Mr. Mianulli has failed to link that incident to his race or color.  *See Barbour v. Browner*, 181 F.3d 1342, 1348 (D.C. Cir. 1999) (two incidents of alleged harassment were not severe or pervasive enough to alter conditions of employment).  Accordingly, Mr. Mianulli has not met his burden to survive summary judgment on a claim of racial harassment.

## B.  Retaliation

It is unlawful for an employer to take a materially adverse action against an employee because of the employee's engagement in statutorily protected activity, *i.e.,* the employee's complaint of unlawful discrimination.  *See Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-70 (2006).  To establish a prima facie case of retaliation, a plaintiff must show that: 1) he engaged in protected activity; 2) he suffered from a materially adverse act; and 3) a causal connection exists between the protected activity and the employer's act.  *Holcomb v. Powell*, 433 F.3d 889, 901-02 (D.C. Cir. 2006).  In order to prevail on a retaliation claim, an employee must show that he engaged in protected activity and, as a consequence, his employer took a materially adverse action against him.  *Weber v. Battista*, 494 F.3d 179, 184 (D.C. Cir. 2007).  A materially adverse action is one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Burlington*, 548 U.S. at 57.

Mr. Mianulli's claim of retaliation is based upon a phone call that he allegedly made to his second-line supervisor, Mr. McConnell, on March 23, 2004.  Mr. Mianulli asserts that in that phone call he "complained about [Sammy] Rogers' discriminatory treatment towards him."  Pl.'s Opp'n at 13.  Mr. Mianulli testified in his deposition that he "stated to [McConnell] that [he] felt [he] was a victim of racial discrimination."  Def.'s Mot., Ex. A, Mianulli Dep. at

146.  Mr. Mianulli further alleges that on March 24, 2004, Mr. Rogers told him his employment

was ending because of the call he made to Mr. McConnell the day before.  Pl.'s Opp'n, Ex. A,

Mianulli Dep. at 155.

Mr. Mianulli has not presented evidence that he was terminated *because of* the

protected activity.  An employer must be aware of the protected activity for it to have caused the

adverse employment action.  *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276,

292 (2d Cir. 1999).  Moreover, an adverse employment action taken after protected activity is not

caused by the protected activity if the employment action was contemplated prior to the protected

activity.  *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001).

There is no evidence in the record that Mr. Worth, who made the decision to

terminate Mr. Mianulli, had any knowledge of the protected activity.  *See* Def.'s Facts ¶ 12 ("Mr.

Worth made the ultimate decision to terminate Plaintiff's probationary employment.").  Indeed,

Mr. Worth testified in his deposition that he was not aware of the phone call when he made the

termination decision; in fact, Mr. Worth had been considering whether to terminate Mr. Mianulli

for several days before March 23, 2004.  Def.'s Reply, Ex. H-1, Worth Dep. at 219-21; Def.'s

Mot., Ex. E, McConnell Decl. ¶ 7 (noting that Mr. Worth advised Mr. McConnell of Mr.

Mianulli's poor performance approximately ninety days before Mr. Mianulli was terminated).

Mr. Mianulli argues that the proximity in time between the phone call and the termination is

enough to create a causal connection.  Although a close proximity in time between protected

activity and a materially adverse action can suggest a retaliatory motive, if the person taking the

adverse action is unaware of the protected activity, the timing does not give rise to such an

inference.  Because there is no evidence that Mr. Worth was aware of the protected activity at the

time he decided to terminate Mr. Mianulli, Mr. Mianulli cannot show that he was terminated in

retaliation for such protected activity.

Even if Mr. Mianulli had made out a *prima facie* case of retaliation, his retaliation

claim fails because USPS has advanced a legitimate, non-discriminatory reason for his discharge,

namely performance deficiencies.  USPS points to evidence that it had concerns about Mr.

Mianulli's performance and warned him about it in February 2004; that Mr. Mianulli failed to

notify his supervisor about the status of his projects, as directed; and that he failed to complete

the Performance Action Plan successfully — all forming the basis for his termination and all

before his March 23, 2004 phone call to Mr. McConnell.  On this record no reasonable jury could

infer that Mr. Mianulli was terminated because he engaged in protected activity.

## IV. CONCLUSION

There are no genuine issues as to any material facts that would preclude the

issuance of summary judgment in this case.  Mr. Mianulli has failed to show that a reasonable

jury could infer that USPS engaged in racial discrimination, racial harassment, or retaliation.

Accordingly, USPS's motion for summary judgment [Dkt. # 24] will be granted and this case

will be dismissed.  An Order consistent with this Memorandum Opinion is issued separately.


DATE:  July 16, 2009                    _____/s/_____
                                        ROSEMARY M. COLLYER
                                        United States District Judge